UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE:<br><br>Geremy Lamar Huff,<br><br>Debtor. | Bankruptcy Case No.:26-00526-eg<br><br>Chapter: 11 |

# OBJECTION OF LINCOLN FUNDING SOLUTIONS, LTD. TO APPROVAL OF DEBTOR'S DISCLOSURE STATEMENT AND REQUEST FOR SUPPLEMENTAL DISCLOSURES CONCERNING NONDEBTOR CORPORATE ASSETS, LITIGATION PROCEEDS, AFFILIATED TRANSACTIONS, AND TREATMENT OF LINCOLN'S CLAIM

Lincoln Funding Solutions, Ltd. ("Lincoln"), a judgment creditor of Geremy Lamar Huff (the "Debtor") and P&G Logistics, Inc. ("P&G"), respectfully submits this objection to the Disclosure Statement filed October 4, 2026, ECF No. 124 (the "Disclosure Statement"), pursuant to 11 U.S.C. §§ 541, 1125, and 1129, and applicable Federal Rules of Bankruptcy Procedure.

Lincoln requests that the Court decline to approve the Disclosure Statement in its present form and require the Debtor to provide materially more complete information concerning the ownership, valuation, and availability of litigation proceeds, the separate legal existence and obligations of affiliated corporations, the Debtor's financial transactions, and the treatment of Lincoln's judgment.

In support thereof, Lincoln states as follows:

## I. PRELIMINARY STATEMENT

1. This objection concerns fundamental deficiencies in the Debtor's proposed reorganization, particularly the treatment of anticipated litigation proceeds arising from assets and contractual rights belonging to P&G, a separate corporation that has not filed bankruptcy.
2. Lincoln holds a judgment in the principal amount of $252,314.26 against the Debtor and affiliated entities, including P&G Logistics, Inc., together with post-judgment interest accruing from July 2, 2025, the date of entry of the judgment, at the applicable statutory rate, plus any recoverable costs.
3. Lincoln's judgment has been domesticated in South Carolina, and Lincoln has been granted intervention in litigation pending in Spartanburg County involving the Debtor, P&G, Terrel Beckham, and related entities.
4. The Debtor's Disclosure Statement identifies approximately $635,466.67 in anticipated net proceeds from that litigation and includes those proceeds among the purported contractual receivables available to fund his individual Chapter 11 Plan.
5. However, the Disclosure Statement itself identifies P&G as the owner of the FedEx delivery routes, vehicles, and contractual rights underlying substantial portions of the Beckham litigation.

6. Moreover, in a motion filed June 17, 2026, in the Spartanburg County litigation, the Debtor and P&G, through counsel, expressly represented that P&G is a separate corporation that has never filed bankruptcy and that its causes of action belong to the corporation itself.
7. On October 14, 2026, this Court entered a Rule to Show Cause, ECF No. 129, independently questioning the Debtor's identification of five separate legal entities, including P&G, as assumed or former business names in his individual bankruptcy petition.
8. The Court specifically observed that the captions of the Plan and Disclosure Statement may erroneously suggest that those entities are parties to this bankruptcy proceeding or are subject to the automatic stay.
9. These circumstances raise a fundamental question concerning the Debtor's proposed reorganization: If P&G Logistics, Inc. is a separate corporation that has not filed bankruptcy, and if its causes of action against the Beckham defendants belong to P&G itself, what legal authority permits the Debtor to include the proceeds of those corporate claims in his individual Chapter 11 Plan while proposing to satisfy only a fraction of Lincoln's outstanding judgment against both the Debtor and P&G?

10. The Disclosure Statement does not adequately answer that question.
11. Lincoln's interest in the Beckham litigation is particularly significant because the Debtor repeatedly represented that Lincoln would be repaid from the proceeds of the contemplated Beckham transaction.
12. During the negotiations and attempted completion of that transaction, the Debtor repeatedly requested and received funding from Lincoln, which materially supported his business operations.
13. The Debtor's assurances concerning repayment were memorialized not only through repeated communications but also through a sworn affidavit concerning payment from the contemplated sale proceeds.
14. The Disclosure Statement does not adequately address those commitments or explain whether and how they affect the proposed treatment of Lincoln's claim.
15. Additional material deficiencies concern the ownership and valuation of the Beckham claims, the substantial anticipated deduction for litigation attorneys' fees, FedEx's role in the alleged loss of delivery routes, subsequent business arrangements between the Debtor and the Beckham parties, projected recoveries from Christopher McCoy, and financial transactions involving TG Studio, Inc.
16. Lincoln does not ask the Court to resolve the merits of those disputes at this stage.
17. Lincoln requests the information necessary for creditors to evaluate the proposed Plan and understand whether the Debtor is relying upon property legally belonging to separate corporations while failing to account for the creditors of those corporations.

## II. LINCOLN'S JUDGMENT AND STATUS AS AN INTERVENING PARTY

18. On or about July 2, 2025, Lincoln obtained a judgment in the principal amount of $252,314.26, plus applicable post-judgment interest and recoverable costs, against the Debtor, P&G, and CMH Logistics, Inc.
19. The judgment was subsequently domesticated in South Carolina.
20. Lincoln thereafter moved to intervene in the action captioned *Geremy Huff and P&G Logistics, Inc. v. Terrel Beckham, Creative Distribution and Services, LLC, and Creative*

*Delivery Services, Inc.*, Case No. 2025-CP-42-02628, pending in the Spartanburg County Court of Common Pleas.

21. The state court granted Lincoln's motion to intervene on November 13, 2025.
22. Lincoln is therefore both a creditor in this bankruptcy proceeding and a judgment creditor of a non-debtor corporation whose claims form a substantial part of the Debtor's projected Plan funding.
23. Lincoln's intervention does not, by itself, establish ownership of the Beckham causes of action or priority over all proceeds.
24. Nevertheless, Lincoln's judgment against P&G and its status as an intervening party are material to any proposed distribution or disposition of proceeds legally belonging to P&G.
25. The Disclosure Statement fails to adequately address those rights or explain how they would be affected by the Debtor's proposed treatment of the Beckham recovery.
26. The Debtor's original bankruptcy petition also lists Lincoln among his twenty largest unsecured creditors in the amount of $252,314.26 while identifying a lien associated with Lincoln's claim.
27. Lincoln requests clarification of the nature, extent, validity, and proposed treatment of any security interest or lien attributed to Lincoln, including reconciliation of the original petition with the Debtor's subsequent schedules and Plan.

## III. THE COURT'S OCTOBER 14, 2026 RULE TO SHOW CAUSE

28. On October 14, 2026, this Court entered a Rule to Show Cause, ECF No. 129, directed to the Debtor and his bankruptcy counsel, Randy A. Skinner.
29. The Court observed that the Debtor's original voluntary petition, ECF No. 1, identified GLH Delivering Services, CMH Logistics, GT Food, P&G Logistics, and Paisley Logistics as assumed or former business names.
30. The Court further observed that these names correspond to five separate legal entities wholly owned by the Debtor.
31. Official Form 101 expressly instructs an individual debtor not to list the name of a separate corporation, partnership, or limited liability company that is not filing the petition.
32. The Court specifically identified the potential for confusion among creditors and parties in interest regarding whether those separate entities are bankruptcy debtors or are protected by the automatic stay.
33. Significantly, the Court also observed that the captions of recently served pleadings, including the Plan and Disclosure Statement, contain these additional entities and may erroneously suggest that they are parties to this bankruptcy proceeding.
34. The Court directed the Debtor and his counsel to show cause why the voluntary petition should not be amended to remove those names.
35. The Court established November 10, 2026, as the deadline for responses or objections to the Rule to Show Cause and scheduled a hearing for November 17, 2026.
36. Lincoln submits that the Court's concerns are directly relevant to the adequacy of the Disclosure Statement.
37. The issue is not merely one of inaccurate captions or business names.
38. The Debtor's identification of separate corporations as former DBAs must be considered alongside the proposed use of litigation proceeds arising from corporate assets.

39. Correcting the petition or removing the corporations' names from the captions would not, standing alone, resolve whether the Debtor is improperly treating corporate property as available for distribution through his individual bankruptcy estate.
40. Lincoln therefore requests that any supplemental Disclosure Statement clearly distinguish the Debtor's personal assets from the property of each separate corporation and identify the legal basis for any proposed use of corporate assets or proceeds to fund his individual Plan.

## IV. THE DEBTOR'S EXPRESS ACKNOWLEDGMENT IN STATE COURT THAT P&G'S CLAIMS BELONG TO P&G

41. On June 17, 2026, the Debtor and P&G, through counsel, filed a Motion and Memorandum to Alter or Amend and/or to Lift Stay in the Spartanburg County litigation.
42. That motion expressly represented that P&G is a separate South Carolina corporation that has never filed bankruptcy.
43. The motion further asserted that Huff's ownership interest in P&G may constitute property of his bankruptcy estate, but that the corporation's causes of action belong to the corporation itself.
44. The motion stated "P&G's claims are its own."

45. The Debtor and P&G relied upon this distinction in seeking to continue the Beckham litigation notwithstanding the Debtor's individual bankruptcy filing.
46. Lincoln submits that the Debtor cannot rely upon P&G's separate corporate existence to establish that its causes of action may proceed independently in state court while simultaneously treating the anticipated proceeds of those same claims as personal bankruptcy assets without identifying a legally sufficient basis for doing so.
47. The Disclosure Statement identifies approximately $635,466.67 in anticipated net Beckham litigation proceeds among the Debtor's contractual receivables.
48. Yet the state-court motion expressly acknowledges that claims belonging to P&G are not automatically property of Huff's individual bankruptcy estate.
49. Accordingly, Lincoln respectfully submits that the Debtor must answer the following question before creditors can meaningfully evaluate the proposed Plan: If P&G's claims belong to P&G, and P&G is not in bankruptcy, what legal authority permits Huff to include the proceeds of those claims in his individual Chapter 11 Plan while proposing to pay only a fraction of Lincoln's judgment against both Huff and P&G?

50. This question is particularly significant because Lincoln holds a judgment against P&G itself.
51. If the proceeds of the Beckham litigation belong to P&G, they cannot simply be presumed available for distribution to Huff's personal creditors without consideration of P&G's separate obligations and applicable law.
52. The Debtor must identify whether he contends that the relevant proceeds will become available through a lawful corporate distribution, assignment, repayment, settlement allocation, or some other legally recognized mechanism.
53. The Disclosure Statement must also identify the treatment of existing corporate creditors, including Lincoln, in connection with any such transaction.
54. Lincoln respectfully requests that the Court require the Debtor to reconcile the representations made in the state-court motion with the treatment of the Beckham proceeds in the Disclosure Statement.

## V. P&G'S CORPORATE ASSETS ARE NOT AUTOMATICALLY PROPERTY OF HUFF'S INDIVIDUAL BANKRUPTCY ESTATE

55. Section 541 of the Bankruptcy Code generally includes within a debtor's estate the legal and equitable interests in property held by the debtor at commencement of the case.
56. An individual's ownership of corporate stock or other equity interests may constitute property of that individual's bankruptcy estate.
57. However, ownership or control of a corporation does not automatically make the corporation's separate assets, contracts, or causes of action property of the shareholder's individual bankruptcy estate.
58. The Disclosure Statement identifies P&G as the owner of twelve FedEx delivery routes and twenty-five delivery vehicles involved in the Beckham transaction.
59. It further identifies causes of action arising from alleged nonpayment for those routes and vehicles, conversion of corporate property, diversion of funds allegedly owed to P&G, and interference with P&G's contractual relationships.
60. The Disclosure Statement nevertheless aggregates the anticipated proceeds of the Beckham litigation with other assets designated as the Debtor's contractual receivables.
61. The Disclosure Statement does not adequately allocate the causes of action between Huff individually and P&G.
62. Nor does it establish that P&G has transferred its claims or anticipated proceeds to Huff.
63. The Debtor should therefore be required to identify each material Beckham claim, its legal owner, and the proposed recipient of any judgment or settlement proceeds.
64. The Debtor should also disclose any corporate resolutions, assignments, distribution agreements, settlement arrangements, or other instruments upon which he relies to establish that corporate proceeds will become available to his individual estate.
65. To the extent the Debtor contends that P&G's assets may be used to satisfy personal Plan obligations, he must identify the legal basis for that treatment and address the rights of P&G's creditors.
66. Lincoln submits that these matters are indispensable to an informed evaluation of the Plan.

## VI. THE DEBTOR'S PERSONAL BANKRUPTCY DOES NOT AUTOMATICALLY DISCHARGE P&G'S LIABILITY TO LINCOLN

67. Lincoln's judgment was entered against the Debtor and separate corporate entities, including P&G.
68. P&G has not filed bankruptcy, according to the Debtor's own representations in the state-court litigation.
69. Under 11 U.S.C. § 524(e), discharge of an individual debtor's obligations generally does not affect the liability of a separate entity for the same debt.
70. Accordingly, a discharge granted to Huff personally does not automatically extinguish P&G's liability on Lincoln's judgment.
71. Lincoln requests that the Disclosure Statement and Plan clearly distinguish the Debtor's personal liability from the separate obligations of P&G and other non-debtor entities.
72. Lincoln does not consent to any provision purporting to release P&G from liability on Lincoln's judgment through the Debtor's individual bankruptcy case.
73. Nor does Lincoln consent to any unauthorized transfer or distribution of P&G's assets that would impair Lincoln's legally enforceable rights as a corporate judgment creditor.

74. Lincoln expressly reserves all rights concerning enforcement of its judgment against P&G, subject to applicable law and valid court orders.
75. Lincoln further requests that no approval of the Disclosure Statement be construed as determining the validity, priority, or enforceability of any judgment lien, security interest, or other right Lincoln may possess.

## VII. HUFF'S REPRESENTATIONS AND SWORN COMMITMENT TO REPAY LINCOLN FROM THE BECKHAM SALE

76. Lincoln's interest in the Beckham transaction is not limited to its judgment or intervention in the pending litigation.
77. During the period in which the Debtor was negotiating and attempting to complete the contemplated sale of P&G's FedEx delivery routes and vehicles to Beckham and his affiliated entities, the Debtor repeatedly requested funding directly from Lincoln.
78. These requests occurred both before the contemplated transaction and during the period in which the transaction was being negotiated and pursued.
79. Lincoln was not the Debtor's only source of business funding.
80. Nevertheless, Lincoln provided substantial financial support that materially assisted the Debtor's businesses in continuing operations during the relevant period.
81. In recorded telephone conversations, the Debtor repeatedly represented to Lincoln that the Beckham transaction was pending and that Lincoln would be repaid from the anticipated proceeds.
82. Lincoln continued to provide funding in the context of those representations.
83. The Debtor's repayment assurances were not limited to informal verbal statements.
84. The Debtor executed a sworn affidavit confirming a commitment that a substantial portion of Lincoln's outstanding debt would be paid from the proceeds of the contemplated Beckham transaction.
85. Lincoln understands that the contemplated payment was approximately $150,000, subject to the precise language of the affidavit and related documentation.
86. These representations are material to Lincoln's financial involvement, the circumstances of the Beckham transaction, and Lincoln's asserted rights concerning the anticipated proceeds.
87. Lincoln does not contend that the affidavit, standing alone, necessarily creates a perfected security interest or establishes priority over other creditors.
88. Nevertheless, the Debtor's representations and sworn commitment cannot reasonably be omitted from a disclosure that proposes to use the anticipated Beckham proceeds as a source of creditor distributions.
89. Lincoln submits that the Debtor should explain the nature and legal effect of those commitments and whether the proposed Plan would impair any enforceable rights arising from them.
90. The Debtor should also explain why Lincoln, which provided funding during the contemplated transaction in reliance upon repeated repayment representations and subsequently intervened in the litigation, is proposed to receive only the distribution applicable to its allowed claim without a specific explanation of the asserted rights arising from those circumstances.
91. Lincoln expressly reserves its right to challenge any proposed reduction or impairment of its claim to the extent permitted by applicable law.

## VIII. THE BECKHAM LITIGATION RECOVERY AND ATTORNEY-FEE DEDUCTION ARE INSUFFICIENTLY EXPLAINED

92. The Disclosure Statement identifies approximately $953,200 in specified damages associated with the Beckham litigation.
93. These amounts include approximately $84,700 concerning the vehicle rental agreement, $312,000 concerning the purchase and sale agreement and FedEx routes, and $556,500 concerning the alleged conversion of twenty-five vehicles.
94. After deducting estimated attorney compensation of approximately thirty-three percent, the Debtor projects a net recovery of approximately $635,466.67.
95. The estimated deduction for attorneys' fees is approximately $317,733.33.
96. The Disclosure Statement does not adequately identify the parties to the applicable attorney-fee agreement, the contractual basis for the proposed percentage, whether litigation expenses are additional, or how the fees would be allocated between claims belonging to the Debtor individually and claims belonging to P&G.
97. The Disclosure Statement also does not adequately explain whether the estimated fee would apply to a settlement, judgment, or other recovery, or whether additional litigation expenses could further reduce the anticipated proceeds.
98. These matters are particularly important because P&G is a separate corporation and the Debtor's own state-court representations establish that P&G's causes of action belong to the corporation itself.
99. If the substantial majority of the alleged damages arise from P&G's property and contractual rights, the Debtor must explain why the resulting proceeds, after payment of litigation counsel, would become available to fund his individual Chapter 11 Plan.
100. The estimated $953,200 represents claimed damages, not a judgment or collected recovery.
101. The underlying litigation remains contested, and the Beckham defendants have asserted defenses and counterclaims.
102. The Disclosure Statement does not adequately address the likelihood of success, potential offsets, material defenses, collection risks, or the extent to which the projected damages belong to P&G rather than Huff individually.
103. The Disclosure Statement also fails to explain whether any amounts attributable to P&G would be subject to corporate liabilities before any distribution could be made to Huff.
104. Lincoln requests disclosure of the material terms of the attorney-fee arrangement, including the identity of the contracting client or clients, the applicable fee percentage, responsibility for litigation expenses, and the proposed allocation of fees and net proceeds between Huff and P&G.
105. Lincoln further requests a more detailed explanation of the legal and factual assumptions underlying the projected recovery.
106. The Debtor should provide alternative Plan funding and creditor-distribution scenarios reflecting a substantially reduced recovery, delayed collection, or a determination that material proceeds belong to P&G.
107. Lincoln does not contend that the Beckham litigation necessarily lacks value or that a contingency fee of approximately one-third is inherently unreasonable.
108. Lincoln contends that the proposed deduction and anticipated net recovery cannot be treated as reliably available to the Debtor's individual estate without meaningful disclosure concerning ownership, the fee arrangement, litigation risk, and collectability.

# IX. INADEQUATE EXPLANATION OF FEDEX'S ROLE IN THE ALLEGED LOSS OF DELIVERY ROUTES

109. The Disclosure Statement alleges that Beckham obtained access to P&G's FedEx contractor portal in anticipation of the contemplated sale.

110. It further alleges that Beckham changed access credentials, redirected payments, and caused P&G's delivery routes to be transferred or reassigned to Beckham-controlled entities without authorization.

111. However, the Disclosure Statement does not adequately explain how the alleged transfer of FedEx routes occurred under the applicable contractor agreements and operating procedures.

112. In particular, the Disclosure Statement does not identify whether FedEx approved, authorized, rejected, or otherwise participated in the alleged reassignment or transfer of the routes.

113. Nor does it explain whether FedEx independently terminated, modified, or reassigned any relevant operating agreements.

114. Lincoln submits that the role of FedEx is material because the Debtor's projected damages depend substantially upon the circumstances under which the routes and associated contractual rights were allegedly lost.

115. The Disclosure Statement does not provide sufficient information to distinguish among an unauthorized diversion by Beckham, action independently undertaken by FedEx, or some combination of events.

116. Lincoln does not ask this Court to determine the merits of the Beckham litigation.

117. Rather, Lincoln requests disclosure of the material contractual provisions, communications, and circumstances underlying the alleged loss or reassignment of the routes.

118. Without such information, creditors cannot meaningfully assess the basis, risks, or potential value of the claims.

# X. FAILURE TO DISCLOSE SUBSEQUENT DELIVERY ROUTE ARRANGEMENTS AND INCOME

119. Lincoln has information indicating that, after the alleged unauthorized taking or transfer of P&G's FedEx routes and vehicles, the Beckham parties subsequently provided the Debtor with delivery routes associated with another company.

120. Lincoln understands that Beckham or his affiliated entities held contractual rights associated with those routes.

121. Lincoln further understands that the Debtor operated the routes and earned income from those operations.

122. The Disclosure Statement does not adequately describe this subsequent arrangement or explain its financial significance.

123. The omission is material because the Disclosure Statement presents the Beckham transaction primarily in terms of the alleged loss of routes, vehicles, and contractual revenue.

124. The existence of a subsequent revenue-producing arrangement between the Debtor and the same parties accused of causing those losses raises questions concerning the calculation of damages, mitigation, possible offsets, and the complete economic consequences of the parties' dealings.

125. Lincoln does not contend that the subsequent arrangement necessarily extinguishes the Debtor's claims or establishes that the alleged losses were fully compensated.

126. Rather, Lincoln submits that creditors are entitled to understand the nature and economic significance of the arrangement before relying upon the projected Beckham recovery.

127. Lincoln requests that the Debtor identify the company associated with the subsequent routes, the legal entity through which the routes were operated, the dates and duration of the arrangement, and the consideration received.

128. Lincoln further requests disclosure of the gross revenue, net income, and other compensation generated by those operations, together with an explanation of whether the arrangement was connected to the disputed Beckham transaction.

129. The Debtor should also explain whether any resulting benefits have been reflected in the damages claimed against Beckham or in the Debtor's financial disclosures.

## XI. INADEQUATE DISCLOSURE CONCERNING THE MCCOY RECOVERY AND SUBSEQUENT CKM TRANSACTION

130. The Disclosure Statement identifies a substantial judgment arising from transactions involving Christopher McCoy and CKM, Inc.

131. It further acknowledges that McCoy filed Chapter 7 bankruptcy on June 1, 2026.

132. The Debtor projects approximately $18,472.38 in anticipated recovery from the McCoy matter.

133. That projection depends upon the administration of McCoy's bankruptcy estate, the assets available for distribution, the validity and priority of claims, and the amount ultimately collected by the Chapter 7 trustee.

134. The Disclosure Statement does not adequately explain whether the projected amount represents an actual trustee distribution estimate or a preliminary calculation.

135. It also identifies the underlying judgment as involving CMH Logistics and the Debtor, without adequately explaining the ownership and allocation of any resulting recovery.

136. Lincoln has received information directly from Christopher McCoy indicating that the Debtor participated in arranging or facilitating a subsequent sale of FedEx routes associated with CKM and received compensation in connection with that transaction.

137. Lincoln does not presently know the amount of such compensation or the precise date and method of payment.

138. Lincoln identifies this information as a matter requiring clarification, not as an established judicial finding.

139. The Disclosure Statement acknowledges a subsequent CKM sale but does not adequately explain the Debtor's alleged involvement or compensation.

140. Lincoln requests that the Debtor disclose his role in that transaction, the consideration involved, and any commission, fee, reimbursement, or other financial benefit received personally or through an affiliated entity.

141. The Debtor should also explain whether any such compensation was reflected in applicable bankruptcy schedules, statements of financial affairs, operating reports, or other required disclosures.

142. Lincoln further requests clarification concerning the ownership of the McCoy judgment and the proposed allocation of any resulting recovery.

## XII. INADEQUATE DISCLOSURE OF INSIDER TRANSACTIONS AND THE DEBTOR'S RELATIONSHIP WITH TG STUDIO, INC.

143. The Disclosure Statement represents that the Debtor made no transfers of his personal assets to insiders during the twelve months preceding his bankruptcy filing.

144. That representation is limited to personal assets and the specified period. It does not, by itself, address transfers involving separate corporations or transactions outside that period.

145. Lincoln previously provided business funding to entities associated with the Debtor under agreements containing restrictions concerning the permitted use of proceeds.

146. During recorded telephone conversations, the Debtor stated that proceeds from funding provided to affiliated business entities would be used for TG Studio, Inc.

147. TG Studio is a business associated with the Debtor's wife.

148. Although Lincoln understands that the Debtor's wife may be the legal owner of TG Studio, the business's publicly accessible website has identified both the Debtor and his wife as co-owners.

149. These circumstances raise material questions concerning the Debtor's legal or beneficial interests in TG Studio and the financial relationship between that business and his other entities.

150. Lincoln does not contend that the Debtor's statements concerning intended use of proceeds establish that any particular transfer was actually completed.

151. Nevertheless, those statements provide a specific basis for requesting clarification concerning whether funds advanced to affiliated entities were subsequently transferred to, expended for, or otherwise used for the benefit of TG Studio.

152. Lincoln requests that the Debtor identify any legal, beneficial, managerial, or financial interest he possesses in TG Studio.

153. Lincoln further requests disclosure of material transfers, loans, payments, capital contributions, reimbursements, distributions, or other financial transactions involving TG Studio, the Debtor, his wife, and entities that received Lincoln's funding.

154. The Debtor should explain whether any such transactions were disclosed in the applicable bankruptcy schedules, statements of financial affairs, or other required filings.

155. Lincoln does not seek a finding of fraud or an avoidance judgment through this objection.

156. Lincoln seeks adequate disclosure of potentially material affiliated-party transactions and financial interests.

## XIII. INADEQUATE DISCLOSURE OF BUSINESS INCOME AND PLAN FEASIBILITY

157. The Disclosure Statement identifies anticipated revenue from truck rentals and distribution activities involving GT Foods.

158. The Debtor proposes to use business income to fund certain Plan obligations while relying substantially upon contractual receivables for general unsecured creditor distributions.

159. The Disclosure Statement does not adequately distinguish the Debtor's personal rights to such income from the rights of separate business entities.

160. Nor does it sufficiently explain the operating assumptions underlying the projected income, including necessary expenses, vehicle obligations, taxes, insurance, maintenance, and other costs.

161. The Plan should also address the consequences of materially reduced business income, delayed litigation recoveries, or the unavailability of corporate litigation proceeds.

162. Lincoln requests sufficient information to evaluate whether the proposed Plan is feasible under 11 U.S.C. § 1129(a)(11).

### XIV. INADEQUATE LIQUIDATION ANALYSIS AND PROJECTED DISTRIBUTIONS

163. The Disclosure Statement estimates a recovery of approximately 10.7% for Class 3 nonpriority unsecured creditors.

164. That estimate depends materially upon projected contractual receivables, including the Beckham litigation recovery.

165. The Disclosure Statement does not adequately explain how those recoveries have been valued in light of disputed ownership, litigation risk, collection expenses, and the separate rights of corporate creditors.

166. A liquidation analysis of the Debtor's individual estate must distinguish between the value of his ownership interests in separate corporations and the assets owned by those corporations.

167. Lincoln requests a more detailed liquidation analysis accounting for the possibility that material Beckham proceeds belong to P&G and are not directly available for distribution to Huff's personal creditors.

168. The Debtor should also provide alternative creditor-recovery estimates reflecting reduced or unsuccessful litigation recoveries.

169. These disclosures are necessary for creditors to evaluate the proposed treatment of their claims and the eventual confirmation requirements of 11 U.S.C. § 1129.

## XV. RESERVATION OF RIGHTS CONCERNING CONFIRMATION, DISCHARGE, AND NONDEBTOR LIABILITY

170. Lincoln expressly reserves all rights to object to confirmation of the Debtor's proposed Plan.

171. Lincoln further reserves its rights concerning the allowance, classification, secured status, and proposed treatment of its claim.

172. Lincoln requests that approval of the Disclosure Statement not be construed as a determination concerning ownership of the Beckham claims, the validity or priority of any lien, or the enforceability of Lincoln's judgment against P&G.

173. Lincoln does not consent to any proposed nonconsensual release of its claims against P&G or other non-debtor obligors.

174. Under 11 U.S.C. § 524(e), discharge of the Debtor's personal liability does not automatically discharge the separate liability of P&G.

175. Lincoln also notes that, under 11 U.S.C. § 1141(d)(5), discharge in an individual Chapter 11 case ordinarily occurs after completion of Plan payments, subject to statutory exceptions.

176. Lincoln reserves any rights it may possess to seek a determination of non-dischargeability or other discharge-related relief, subject to applicable procedural requirements and deadlines.

177. Lincoln acknowledges that this objection does not itself establish non-dischargeability or extend any applicable deadline for commencing an adversary proceeding.

178. Lincoln requests that no order approving the Disclosure Statement be interpreted as adjudicating or waiving such rights.

## XVI. REQUEST FOR SUPPLEMENTAL DISCLOSURES

179. Lincoln respectfully submits that the identified deficiencies materially impair creditors' ability to evaluate the proposed Plan.

180. The Debtor's Disclosure Statement relies upon anticipated litigation proceeds whose ownership, availability, and value have not been adequately explained.

181. The Debtor's own state-court representations acknowledge that P&G's causes of action belong to P&G, while the Disclosure Statement treats anticipated proceeds from those claims as available for the Debtor's individual reorganization.

182. The Court's October 14, 2026 Rule to Show Cause independently identifies related confusion arising from the inclusion of non-debtor corporations in the Debtor's bankruptcy petition, Plan, and Disclosure Statement.

183. Lincoln submits that these issues cannot be resolved solely by correcting the caption or removing business names from the voluntary petition.

184. The Debtor must also clarify the ownership and proposed distribution of the underlying assets and claims.

185. The Debtor must further explain the material terms of the proposed attorney-fee deduction from the Beckham recovery, including how fees and net proceeds would be allocated between the Debtor and P&G.

186. Lincoln therefore requests that the Debtor file an amended or supplemental Disclosure Statement providing adequate information concerning these matters.

187. Lincoln does not request that the Court determine the merits of the Beckham litigation, adjudicate potential claims against TG Studio, or resolve the McCoy dispute in this proceeding.

188. Rather, Lincoln seeks the disclosures necessary to permit creditors and the Court to evaluate the proposed reorganization without relying upon unexplained assumptions concerning corporate property and anticipated recoveries.

## XVII. PRAYER FOR RELIEF

WHEREFORE, Lincoln Funding Solutions, Ltd. respectfully requests that the Court:

**A.** Sustain Lincoln's objection and decline to approve the Disclosure Statement, ECF No. 124, in its present form;

**B.** Require the Debtor to file an amended or supplemental Disclosure Statement clearly distinguishing his individual assets and obligations from those of P&G Logistics, Inc., CMH Logistics, Inc., and other non-debtor entities;

**C.** Require the Debtor to address the concerns identified in the Court's October 14, 2026 Rule to Show Cause, ECF No. 129, insofar as they affect the adequacy of the Disclosure Statement;

**D.** Require the Debtor to reconcile his June 17, 2026 representations in the Beckham litigation that P&G's causes of action belong to P&G with his proposed inclusion of anticipated Beckham proceeds among the assets available to fund his individual Chapter 11 Plan;

**E.** Require the Debtor to identify the legal ownership of each material Beckham cause of action and the legal basis for treating any proceeds belonging to P&G as available to his individual bankruptcy estate;

**F.** Require the Debtor to explain how any proposed transfer, allocation, settlement, or distribution of P&G's litigation proceeds would account for existing corporate obligations and creditor rights, including Lincoln's judgment;

**G.** Require adequate disclosure concerning Lincoln's judgment, its intervention in the Beckham litigation, the Debtor's repayment representations, and the sworn affidavit concerning repayment from the contemplated sale proceeds;

**H.** Require clarification of the classification, secured status, and proposed treatment of Lincoln's claim, including accrued post-judgment interest to the extent allowed by applicable law;

**I.** Require disclosure of the material terms of the attorney-fee arrangement in the Beckham litigation, including the contracting parties, fee percentage, litigation expenses, and allocation of fees and proceeds between the Debtor and P&G;

**J.** Require supplemental disclosure concerning FedEx's role in the alleged loss or reassignment of P&G's delivery routes;

**K.** Require supplemental disclosure concerning the subsequent delivery-route arrangement between the Debtor and the Beckham parties, including revenue, income, consideration, and potential effects upon the claimed damages;

**L.** Require additional disclosure concerning the valuation, ownership, litigation risks, and collectability of the anticipated Beckham recovery;

**M.** Require additional disclosure concerning the McCoy recovery, the ownership of the underlying judgment, and any compensation received by the Debtor in connection with the subsequent CKM transaction;

**N.** Require additional disclosure concerning the Debtor's relationship with TG Studio, Inc., his legal or beneficial interests therein, and material financial transactions involving that entity and his affiliated businesses;

**O.** Require adequate support for projected business income, Plan feasibility, liquidation values, and anticipated creditor distributions;

**P.** Require that any amended Disclosure Statement clearly identify the proposed treatment of claims against non-debtor entities and the legal basis for any proposed effect upon those claims;

**Q.** Decline to approve disclosure that assumes P&G's corporate litigation proceeds are property of the Debtor's individual bankruptcy estate without a legally sufficient explanation;

**R.** Preserve Lincoln's rights to object to Plan confirmation, challenge the treatment of its claim, and enforce its judgment against non-debtor obligors, subject to applicable law;

**S.** Decline to construe approval of the Disclosure Statement as adjudicating the ownership of disputed corporate assets, the validity or priority of Lincoln's asserted rights, or the dischargeability of Lincoln's claim; and

**T.** Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**/*s*/Jason M. Hunter**
Counsel for Lincoln Funding Solutions, Ltd.
Crawford & von Keller, LLC
P.O. Box 4216 Columbia, SC 29240
Phone: 803-790-2626
Email: jhunter@crawfordvk.com
Jason M. Hunter 12999

Dated: October 30, 2026

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: | Bankruptcy Case No.:26-00526-eg |
| Geremy Lamar Huff, | Chapter: 11 |
| Debtor. | |

CERTIFICATE OF SERVICE

This is to certify that I, Sophia Eldridge , a Paralegal with the firm of Crawford & von Keller, LLC am this day, October 30, 2026, serving on the persons named below the Objection to Approval of Disclosure Statement on behalf of Lincoln Funding Solutions, in this matter by placing a copy of same in the United States Mail, postage pre-paid, in envelopes addressed as follows:

Geremy Lamar Huff
4 Blockhouse Road
Piedmont, SC 29673

Randy A. Skinner
Skinner Law Firm, LLC
300 North Main Street
Suite 201
Greenville, SC 29601

US Trustee's Office
(via electronic notice)

/s/Sophia Eldridge
Sophia Eldridge, Paralegal

Columbia, SC

October 30, 2026